**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**LeBEOUF BROTHERS TOWING CO.,**
**etc., Defendant-Appellee.**

**No. 78–3261.**

United States Court of Appeals,
Fifth Circuit.

July 18, 1980.

Thomas Willard Snook, Dept. of Justice, Civ. Div., Torts Branch (Admiralty), Leonard Schaitman, Dept. of Justice, Civ. Div., Appellate Staff, Michael K. Bell, Dept. of Justice, Civ. Div., Torts Branch, Washington, D. C., for the U. S.

Margaret R. Tribble, William E. O'Neil, New Orleans, La., for defendant-appellee.

Before THORNBERRY, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

In this appeal from judgment against the Government in its suit to recover clean-up costs under 33 U.S.C. § 1321 (1976) for an oil spill from appellee's tanker barge, we must interpret the clause in section 1321(f)(1) that establishes a third-party de-

fense for the owners of the discharging vessel. Because we conclude that the tugboat hired by the appellees in this case does not constitute a "third party" under section 1321(f)(1), we reverse the judgment and remand the case to the court below.

*I. Facts.*

The parties stipulated the facts as follows. LeBeouf is in the business of transporting petroleum products in tanker barges. In 1974 LeBeouf contracted with Bayou Marine Corporation to obtain a tug and crew that would tow the non-selfpropelled tanker barge LBT # 4 on an itinerary specified by LeBeouf. Bayou secured the M/V Harding R, a tug owned by Barracuda Marine Corporation. The tug crew loaded and unloaded LeBeouf's cargo at the places and times designated in LeBeouf's itinerary. LeBeouf engaged in no other supervision over the crew. In March 1974 the tug crew unloaded oil from the LBT # 4 at Westwego, Louisiana. A tug crewman who was working as a tankerman without a license, in violation of 33 C.F.R. § 155.710(a)(2) (1979), accidentally opened the wrong valve and discharged sixty barrels of crude oil onto the Mississippi River.

Neither LeBeouf, Bayou, nor Barracuda cleaned up the oil spill. Finally the Coast Guard contracted to clean up the spill at a total cost of $38,689. The Government sued to recover this clean-up cost under the Federal Water Pollution Control Act, 33 U.S.C. § 1321, in March 1977. The district court dismissed the Government's suit against LeBeouf because it concluded that the oil spill was caused by a "third party" under section 1321(f)(1).

*II. Third-Party Defense under Section 1321(f)(1).*

Under section 1321(f)(1) the owner or operator of the discharging vessel is liable to the Government for the costs of cleaning up an oil spill

[e]xcept where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omis-

sion of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses . . .

In cases involving inland oil spills, section 1321(g) requires the Government to sue the owner or operator of the discharging vessel for clean-up costs before it can sue a "third party" who may have caused the spill. The statute does not define what constitutes such a "third party."

LeBeouf contends that the term "third party" in section 1321(f)(1) should be interpreted broadly to include all parties—such as the tugboat in this case—over whom the owner-operator has no direct control or supervision. As authority for this interpretation, LeBeouf relies upon the district court opinion in *Tug Ocean Prince, Inc. v. United States*, 436 F.Supp. 907, 923–24 (S.D.N.Y. 1977), *aff'd in part and rev'd in part on other grounds*, 584 F.2d 1151 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499 (1980). In *Tug Ocean Prince* a tug towed a tanker barge into submerged rocks, which caused the barge to spill oil onto the Hudson River. The tug owner sued to limit its liability as a "third party" under section 1321(g) so that damages would be calculated with reference to the weight of the tug alone, not with reference to the combined weight of the tug and barge together. The district court did not discuss section 1321(f)(1), but it treated the tug as a "third party" for purposes of section 1321(g), and construed that statute so that the tug's liability would be limited to damages calculated only with reference to the weight of the tug alone.

A broad interpretation of the term "third party" was rejected by the First Circuit in *Burgess v. M/V Tamano*, 564 F.2d 964, 981–82 (1st Cir. 1977), *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978), in which the court expressly discussed what constitutes a "third party" under section 1321(f)(1). In *Burgess* the court held that a supertanker's temporary local pilot did not constitute a "third party" under section 1321(f)(1). As a result, the owners of the supertanker were held liable for an oil spill that occurred because the local pilot negligently ran the supertanker into a submerged ledge in a Maine harbor. The court concluded that the legislative purpose in drafting section 1321 as a strict liability statute would be undermined unless the third-party defense was narrowly interpreted. Even though the local pilot might be regarded as an independent contractor, he could not constitute a "third party" because the pilot acted for the ship and was subject to its ultimate control. In dicta the court reasoned that a shipyard that installed a defective valve would likewise not constitute a "third party" for the purpose of protecting the shipowner from liability for an oil spill caused by the defect in the valve. If a vandal opened the valve and caused the spill, however, the court said that the third-party defense would apply.

Following the reasoning of the First Circuit in *Burgess*, we conclude that the third-party defense in section 1321(f)(1) must be narrowly interpreted. The statute's comprehensive scheme for preventing and cleaning up oil spills would be undermined if barge owners like LeBeouf could escape strict liability merely by hiring out their operations to tugs and independent contractors. A narrow interpretation of the third-party defense would make it consistent with the other section 1321(f)(1) defenses, which include only narrow exceptions such as acts of God, acts of war, and instances in which the Government's own negligence is the sole cause of the spill. The only significant legislative history relating to the third-party defense also suggests that a narrow interpretation is proper; a committee report indicates that the drafters' primary purpose for including the third-party defense was to cover situations in which a third-party ship collided with an unrelated, oil-carrying vessel and caused a spill. S.Rep.No.91–351, 91st Cong., 1st Sess. 6 (1969).

Under the analysis used in *Burgess*, the tug in this case does not constitute a "third party" that would protect LeBeouf from liability for clean-up costs under section 1321. LeBeouf hired the tug to act in its

place. Although the tug operated as an independent contractor, LeBeouf held ultimate control over it by hiring it in the first place, specifying its itinerary, and retaining it throughout the job. Our narrow interpretation of the third-party defense promotes the goals of the statute and of traditional tort policy because it will encourage barge owners like LeBeouf to select tugs carefully and to insure against potential losses. LeBeouf can also require a tug to indemnify it for losses caused by the tug's conduct alone.

Because the tug does not constitute a "third party" for the purpose of protecting LeBeouf from liability under section 1321, we reverse the judgment and remand the case to the court below.

REVERSED AND REMANDED.